Scileppi, J. (dissenting).
Union Free School District No. 12 of the Town of Hempstead, commonly known as the Malverne-Lakeview School District, lies partially within the villages of Málveme and Lynbrook, and includes some incorporated areas of the Town of Hempstead. The public school facilities are comprised of a senior high school, a junior high school and three elementary schools. At the present time, the junior and senior high schools accommodate all children in grades 6-12 in racially balanced classes. Thus, only the three elementary schools serving grades 1-5 are here in question.
These three elementary schools are so-called neighborhood schools, each serving a small compact residential area and each reflecting the composition of the surrounding residential neighborhood in its pupil enrollment. The attendance zones or areas for each school were laid out many years ago and all parties to the present action agree that considerations of race, color or creed played no part in their formation. Bather, the lines were drawn with such factors in mind as safety, traffic conditions, proximity to the home and various other interests which were in keeping with prevailing attitudes recognizing the advantages of making the school an integral part of a given neighborhood. It was thought that great benefits were derived from such an arrangement in the form of greater parental interest in the activities of the school and greater exchange of ideas between home and school.
*272 The three elementary schools in the district are called the Woodfield Road School, Davison Avenue School apd the Lindner Place School. It seems that while the attendance areas served by these three schools were comparable for some time, the attendance area served by the Woodfield Road School has had a substantial increase in Negro residents and this, naturally, has become reflected in the pupils attending the Woodfield School. So far, the school board has attempted to rectify the resulting imbalance by transferring pupils from Woodfield to one of the other two elementary schools, but the imbalance at Woodfield continues.
In an attempt to correct the racial imbalance in grades 1-5, Negro children, through their parents, appealed to the Commissioner from the refusal of the Board of Education to alter the zoning areas for school attendance, pursuant to section 310 of the Education Law providing for such appeals. The Commissioner appointed a 3-member committee, containing 2 members of the National Association for the Advancement of Colored People, to investigate the situation. This committee found that the attendance areas were of suitable size, as compact as possible, and placed the children within convenient walking distance of their schools. The Woodfield Road pupils were afforded programs of remedial work and enrichment at all grade levels. Relying upon its personal inspection of the three schools, the committee stated that the educational standards, as well as the quality of the teaching, were similar. In addition, the committee noted that the action of the local board was not arbitrary and was not actuated by an attempt to contain the Negro population by means of artificial school zones. A finding was made that the Woodfield Road School was racially imbalanced, and ipso facto social, psychological and educational problems exist in this school district. In short, the committee found that the school district under consideration was “ an excellent example of administrative planning”, not created to separate the races, and that all the tangible aspects of education were equal. The Commissioner, concluding that a racial imbalance deprived the Negro children in Woodfield Road School of equal educational opportunities, ordered that the attendance areas of the district be drawn so that all children from kindergarten through the *273 third grade attend either the Davison Avenue or Lindner Place Elementary School, and that all children in fourth and fifth grades attend the Woodfield Road School.
Although the Legislature has bestowed a vast grant of power upon the Commissioner of Education, the courts do have a limited scope of review. We have held that the courts possess the power to review his acts only when they are “ purely arbitrary ” (Matter of Board of Educ. of City of N. Y. v. Allen, 6 N Y 2d 127, 136). As courts approach the pivotal issue of arbitrariness, proper performance of their function requires that the administrative agency show the actual grounds for its decision (Matter of Scudder v. O’Connell, 272 App. Div. 251). This exposition of the reasons for a decision has a twofold purpose. First, it enables the court to determine whether the findings themselves are properly supported by the evidence, and, second, it is necessary to determine whether the facts found support the decision itself (Matter of Scudder v. O’Connell, 272 App. Div. 251, supra).* In New York Water Serv. Corp. v. Water Power & Control Comm. (283 N. Y. 23) we stated: ‘ ‘ Findings of fact in support of decisions by courts and administrative boards alike serve to give assurance to parties concerned that the decisions are based upon evidence of record and were not reached arbitrarily or influenced by extra-legal considerations * * * findings of fact in some form are essential to enable the parties and any appellate court intelligently to determine whether the decision follows as a matter of law from the facts stated as its basis and whether the findings of fact have any substantial support in the evidence ” (p. 30). Throughout our reports, cases reiterate the substance of the above extract (see, e.g., Matter of Barry v. O’Connell, 303 N. Y. 46; Matter of Perpente v. Moss, 293 N. Y. 325; Matter of Elite Dairy Prods. v. Ten Eyck, 271 N. Y. 488). The Commissioner reasons as follows:
Major premise: Racially imbalanced schools always afford unequal educational opportunities.
Minor premise: This school is racially imbalanced.
*274 Conclusion: Therefore, this school affords unequal educational opportunities.
Since the record before this court is utterly barren of any evidence which supports the Commissioner’s conclusion that racial imbalance (an uncertain and indefinable phrase) necessarily results in unequal educational opportunities, I am constrained to hold that he has acted in a “purely arbitrary” manner. If it is not purely arbitrary to conclude and give no reasons therefor, I cannot conceive of any situation which may be so characterized.
Although I recognize the vast amount of power which is deposited in the Commissioner, I am unwilling to join the majority in placing him in an insulated position from which he is permitted to pronounce unreviewable conclusions devoid of any evidentiary support. Undoubtedly such is the reasoning of the prevailing opinion which, for all practical purposes, closes the courthouse doors to those who seek to review acts of the Commissioner in this area. If they are correct in the conclusion reached, the majority must be prepared to hold that assignment of pupils to create an ethnic or religious balance, or even the transportation of pupils (e.g., bussing) to implement a balancing plan, is beyond the review of the courts and may not be questioned therein. When the Commissioner states that he is acting in furtherance of sound educational policies, albeit there is no evidence in the record to support him, the majority holds that the courts will not be available for review.
I am unimpressed by the argument that the Commissioner might produce evidence and make findings to support his conclusions. Our function is to judge a case on the record before the court, not on assumption, speculation or conjecture.
Viewing the ease in this posture, I need reach neither the impact of section 3201 of the Education Law nor the constitutional question to which Judge Van Voobhis has addressed himself, both of which the majority necessarily passes upon. However, I do state that I do not consider Matter of Balaban v. Rubin (14 N Y 2d 193) authority in cases of this nature because (1) that case concerned the selection of a site for a new school; (2) race was not the sole factor which actuated the choice of location, and (3) there were neither transfers nor “ oppressive results ” involved.
*275 For the reasons stated above, I vote to reverse the order of the Appellate Division.
Chief Judge Desmond and Judges Dye, Ftjld, Burke and Bergan concur in Per Curiam opinion; Judges Van Voorhis and Scileppi dissent in separate opinions.
Order affirmed.

 Of course, the reasons underlying the determination are necessary to enable an aggrieved petitioner to ascertain which avenue of attack should be selected.