PETITION OF NEW ENGLAND TEL. & TEL. CO., RE INCREASED RATES.

(66 A2d 135)

February Term, 1949.

Present: SHERBURNE, JEFFORDS, CLEARY and ADAMS, JJ., and BLACK, Supr. J.

Opinion filed May 3, 1949.

*John D. Carbine* and *Guy M. Page* for the petitioner.

*Clifton G. Parker,* Attorney General, for the State of Vermont.

*Arthur L. Graves* for the Public.

Ernest E. Goodrich *pro se.*

JEFFORDS, J. This is an appeal by the New England Telephone and Telegraph Company from an order of the public service commission. The case comes to this Court under the provisions of § 9296 of V. S., 1947 rev.

Appearances of several attorneys are noted in the record for various parties. Among such is that of Arthur L. Graves, Esq., who appeared for the Public and who took a leading part in the hearing below and here. The attorney general appeared for the State and we shall hereafter refer to the parties as the company and the state.

On December 3, 1946, the company filed with the commission a revised schedule of rates which rates became effective under bond on February 1, 1947. On October 30, 1947, the company filed a second revised schedule of rates. These later rates went into effect on December 1, 1947, under a second bond. Protests were entered to the increase in rates set forth in both of these schedules and hearings on them were held before the commission. As a result of these hearings the commission found that the rates which became effective February 1, 1947, were only temporary and of an emergency nature and for the purpose for which they were filed were just and reasonable. It also found that the rates set forth in the schedule which became effective December 1, 1947, were not just and reasonable. It issued its order dated May 26, 1948, and effective as of December 1, 1947, setting forth a schedule of rates and charges higher than those set forth in the schedule effective February 1, 1947, and lower than those which the company had filed to become effective December 1, 1947. The commission found that its schedule, above mentioned, was just and reasonable. These findings follow the language of V. S. § 9368 which provides that when upon hearing rates are found to be unjust or unreasonable

the commission may order and substitute therefor such rates as it shall find at the hearing to be just and reasonable.

We are met at the threshold by the claim of the company, supported by adequate exceptions, that the findings of fact made by the commission are so deficient in the determination of essential and controlling basic facts that an order based on the findings is necessarily so arbitrary that it constitutes denial of procedural due process.

V. S. § 9295 provides: "The commission shall hear all matters within its jurisdiction, and make its findings of fact. . . . Its findings of fact shall have the force and effect of a special master on transfer of the cause to the supreme court for review."

■ The requirement that the commission make its findings of fact imposes upon it the duty to sift the evidence and state the facts. *Hammonds Inc.,* v. *Flanders,* 109 Vt 78, 81, 191 A 925; *In re Est. of Wolff,* 108 Vt 54, 57, 182 A 187; *Francis.* v. *London Guarantee & Accident Co.,* 100 Vt 425, 138 A 780; *Hooper* v. *Kennedy,* 100 Vt 376, 138 A 778; *Raithel* v. *Hall,* 99 Vt 65, 70, 130 A 749.

■ A reasonable and usual method for a commission to adopt in fixing rates is to determine the kind and amount of a proper rate base. It then determines, upon all of the evidence in the case, the rate of return which the utility should reasonably be entitled to earn thereon. In order to fix rates to provide for this return it is necessary to determine the allowable expenses for the period in question. It follows that the rates to be fixed must be such as will produce sufficient revenue after deducting the allowable expenses to allow the rate of return determined upon.

■ Whether the method adopted in fixing rates follows the one just suggested in the order of the steps taken is immaterial. It is apparent, and it is shown by all the cases which we have read touching on this point, that in order to reach a fair judgment of rates to be fixed, it is necessary that a proper rate base and allowable expenses be determined. *West Ohio Gas Co.* v. *Pub. U. Com.,* 294 US 63, 55 S Ct 316, 79 L ed 761; *Lindheimer* v. *Ill. Bell Tel. Co.,* 292 US 151, 54 S Ct 658, 78 L ed 1182; *Smyth* v. *Ames,* 169 US 466, 18 S Ct 418, 42 L ed 819; *New England Tel. & Tel. Co.* v. *State,* 95 NH 353, 64 A2d 9; *State ex. rel. Pac. T. & T. Co.* v. *Department of Public Service,* 19 Wash 2d 200, 142 P2d 498; *Re Orange & Rockland E. Co.,* 49 PURNS 257; 43 Am Jur p. 674, § 156. The much discussed case of *Federal Power*

*Com.* v. *Hope Natural Gas Co.,* 320 U S 591, 64 S Ct 281, 88 L ed 333, did not change this rule for, as we shall see later, this case did not reject judicial right of review as to reasonableness of rates and, obviously, if it be held that no yardstick is necessary whereby to test this question then judicial review as to reasonableness of rates would become utterly meaningless.

In the present case it is apparent that it was tried upon evidence presented as to average net investment in property used for intrastate operations as a rate base. In its findings the commission not only failed to find what this amount would be for 1948 but it stated that: "We do not speculate as to what the average net investment in Vermont will be on December 31, 1948, or thereafter because it is too dependent upon conditions which may or may not materialize." It should be noted that this failure to find is not based on lack of evidence produced by the company upon which was the burden of proof. It appears to us from the record that there was no need for speculation, in the sense of mere guess or conjecture, on this essential element but that a fair probable estimate could have been made.

The commission did find that on December 31, 1947, the company had a net investment in Vermont which was used or usable in furnishing telephone service to its customers in Vermont in the amount of $10,002,348.29. It is apparent that this figure was not used as the rate base in the estimate of the rate of return, for this rate, according to the commission in its findings, was based on its schedule of rates which "should produce a net return on the average net investment in Vermont in excess of 4%". Moreover, it is clear that a year end figure for 1947 could not properly be considered as a rate base for average net investment in 1948, or thereafter.

The commission found that under the rate schedule set forth in its order, the gross telephone revenues which the company would receive in 1948 would be $5,070,881. It not only failed but refused to find what the allowable expenses would be during that period, as it stated in its findings "We do not speculate as to what the net return to the Petitioner (company) on its average net investment in Vermont will be in 1948 or thereafter under the rate schedule set forth in the Order herein because the items of expense which determine such net return are entirely without the jurisdiction of this Commission and are wholly within the control of the management of the Petitioner."

Here again the commission does not base its refusal to find expenses on the ground of failure of proof. Indeed it would seem that it could not properly give this ground as a reason for such refusal as it appears from the record that there was evidence in the case upon which to make a finding on this essential element. If this be not so, the commission should have so stated.

The reasons given by the commission for its refusal in this respect do not appeal to us as being sound. It did have jurisdiction over the items of expense as it had the authority to disallow any which were unreasonable or unwarranted. For this reason such items were not wholly within the control of the company. If it be considered that the commission meant that expenses were entirely within the control of the management as respects their amount, this conclusion is also erroneous as it does not take into account that expenses may of necessity be increased for reasons entirely beyond the control of the company, such as those resulting from a hurricane, flood, or other disaster, or from increased wages due to changing economic conditions or strikes.

The state claims the findings are sufficient because the necessary facts, if any, not expressly found appear by necessary implication from other facts expressly found. In support of this claim it submits a list of authorities beginning with *Winship v. Waterman,* 56 Vt 181, and ending with *Montpelier* v. *Calais,* 114 Vt 1, 39 A2d 350, 357, which hold to the effect that while it is the better practice to report all the facts upon which an ultimate finding is based, it is not legal error to omit to do so, even though the finding be a conclusion resulting from mixed questions of law and fact. The ultimate finding in the present case to sustain which the state invokes the above rule and cited cases is that the rate schedule set forth in the order of the commission is just and reasonable. The state argues that the finding as to net return on average net investment necessarily involves and by necessary implication shows that the commission in making such finding determined from the evidence the intrastate investment, gross revenues, expenses, net earnings and rate of return to be derived therefrom. Thus the state impliedly admits that findings as to these facts are essential for a fair and just determination of the ultimate conclusion of fairness and reasonableness. We have seen that the commission not only failed but refused to find as to at least two of these essential facts, i.e., rate base and expenses. Thus the rule contended for by the state and the cases which it cites in its support do not apply

here as we cannot supply the omission of an essential fact which is not fairly or reasonably inferable from the facts as found. *West v. West,* 115 Vt 458, 460, 63 A2d 864; *Crowley* v. *Goodrich,* 114 Vt 304, 310, 44 A2d 128, 162 ALR 691; *Nelson* v. *Bacon,* 113 Vt 161, 171, 32 A2d 140. In the present case not only are no facts found from which these essential facts could be inferred but, as we have seen, the commission refused to make any findings concerning them.

█ The state claims that any failure on the part of the commission to make findings is not error as the company submitted no requests for findings. The same rule applies here as in a charge to the jury. There it is the duty of the court, without request, to charge upon all the substantial issues in the case, but it is not bound to make every conceivable comment upon the evidence and the weight of it. *Mullett* v. *Milkey,* 113 Vt 42, 48, 29 A2d 806. So here, the commission was required to report fully upon all the substantial issues raised by the material evidence in the case. We wish to state in this connection that even though the parties here were not required to file requests for findings, yet in any case as involved as this, extending over such a long period of time for hearings and requiring full findings, it is very helpful to the trier to have requests submitted and we recommend that this be done in all such cases in the future.

█ The state seems to argue that inasmuch as the commission has found its schedule of rates is just and reasonable in accordance with the language of the statute, this Court has no right to substitute its judgment on that score for that of the commission. It appears to rely on the Hope case, supra, in support of this claim. It is true that we do not sit as a court of revision but we do have the right of review of an order of the commission and, as we have stated previously, the Hope case does not hold to the contrary. It is not necessary here to analyze the opinion in that case to substantiate this statement. Mr. Justice Douglas wrote the majority opinion. In two later cases, *Colorado Interstate Gas Co.* v. *Federal Power Com.,* 324 U S 581, 65 S Ct 829, 89 L ed 1206, and *Colorado-Wyoming Gas Co.* v. *Federal Power Com.,* 324 U S 626, 65 S Ct 850, 89 L ed 1235, the same Justice wrote the opinions for the Court. In each of these cases the necessity is stressed for clarity and completeness in basic or essential findings on which administrative orders rest. The latter case was remanded for further findings. These cases clearly show that an ultimate conclusion

of fairness and reasonableness as to rates is not binding on an appellate court on review and that such a conclusion must be supported by specific findings on the essential elements on which the ultimate finding must be based so that a proper review may be had. In other words, although the Hope case held that a commission was not bound to the use of any single formula or combination of formulae in determining rates it is not thereby relieved from the duty to disclose the "method employed" to reach the prescribed rates, so that the validity of its conclusions may be tested by judical review. *New England Tel. & Tel. Co.* v. *State, supra.*

> "A statement that proposed rates would be unreasonable appears as a conclusion insufficient as a finding unless supported by facts more particularly stated."
> *United States* v. *Chi. M. St. P. & P. R. R. Co.,* 294 U S 499, 55 S Ct 462, 79 L ed 1023.

For other cases which hold that complete findings on all essential elements necessary to support an ultimate conclusion as to reasonableness of rates are necessary in order for an appellate court to intelligently review the conclusion in order to determine whether it is fair and just or whether it is arbitrary and unjust, see *Commonwealth Tel. Co.* v. *P. S. Comm.,* 252 Wis. 481 32 N W2d 247; *State* v. *Tri-State Tel. & Tel. Co.,* 204 Minn 516, 284 NW 294, and *Petition of N. Y. Water Service Corp.,* 283 NY 23, 27 NE2d 221.

The right of this Court to review, under the statute providing for appeals, an order of the public service commission and to test the sufficiency of the findings to warrant the order under the rule that the order must not be unreasonable or arbitrary was recognized in 1912 in the case of *Sabre* v. *Rutland R. R. Co.,* 86 Vt 347, at 368, 85 A 693, Ann Cas 1915 C 1269. This right still exists.

Since essential findings have not been made, we are unable to determine whether the schedule of rates set forth in the order of the commission dated May 26, 1948, to become effective as of December 1, 1947, is just and reasonable, or whether the rates are unjust and unreasonable and thus confiscatory, which is the ultimate question to be decided when rates prescribed by a commission are brought in issue by a utility. *Bluefield Water Works and Imp. Co.* v. *W Va. P. S. Com.,* 262 U S 679, 43 SCt 675, 67 L Ed 1176; *State ex rel. Pac. T. & T. Co.* v. *D. P. S., supra.* Accordingly under the authority of V. S. § 9298 we reverse the order and re-

mand the case for such findings. See *New England Tel. & Tel. Co.* v. *State, supra,* and *Colorado-Wyoming Gas Co.* v. *Federal Power Com., supra.*

There are several other questions presented in the briefs of both parties. Some of these result from exceptions taken while others do not. As they may all occur again for determination by the commission it seems well to here consider these questions and give our answers thereto as best we can from the record before us.

The first of these questions relates to the finding of $10,002,-349.29 as the net investment of the company in Vermont used or usable in furnishing telephone service to its customers therein. We have had occasion previously to mention this item in connection with our discussion of the necessity of a finding of a proper rate base.

The company claims that this finding is not supported by evidence in the case and is contrary to uncontradicted evidence. Both parties apparently agree, and the record bears them out, that this figure represents the company's estimate of its average combined interstate and intrastate investment in this state for the eleven months ending November 30, 1947, less $414,763.80, the amount of the items for plant under construction and property held for future use which, as we shall see, the commission did not allow to be included in the rate base.

The reason for the inclusion of this finding is not at all clear. As we have seen, it was not considered by the commission as the rate base upon which to compute a rate of return. It is now apparent that it could not properly have been so considered as it needs no citation of authorities to show that the jurisdiction of the commission extends only to intrastate operation and matters pertaining thereto. It is so limited by statute. V. S. 9360. The amount of property in this state devoted to interstate operations cannot properly be included in a rate base used to determine just and reasonable rates to be charged for intrastate service. No "end result" could be said to be just and reasonable when reached by such a method.

The state says that the company could not be prejudiced if this ten million dollar figure were used as an intrastate rate base by the commission as it would be higher than a figure based on property used in intrastate operations alone. But if this figure had been so used, such procedure could not properly be sanctioned by us for reasons already stated and for the additional reason that consum-

ers should only pay rates which are just and reasonable with the lower intrastate base used in their determination.

The company excepted to the finding that the rates set forth in the order of the commission would produce local service revenues for 1948 in the amount of $3,413,598 on the ground that this finding is not supported by the evidence. The main reason set forth in the company's briefs in support of this claim is that the item of miscellaneous revenue, amounting to $89,358, was included twice. It is not necessary for us to determine whether this exception of the company is well founded. We merely call the attention of the commission to the claim so it may have it in mind upon a redetermination of the case when the actual figures for 1948 in this respect will be available.

The commission found that telephone plant under construction in the amount of $279,469.78 as set forth in account 100.2 and property held for future telephone use in the amount of $135,294.02 as set forth in account 100.3 are not proper items to be included in determining the average net investment of the company in Vermont. The company excepted to the exclusion of the first of these items from the rate base upon the ground that upon the uncontradicted evidence it was proper for inclusion and that the exclusion thereof is not supported by any evidence. This ground was also given in support of its exception to the exclusion of the second item and it was also stated that its inclusion was required as a matter of law. These two items should be separately discussed.

A public utility company should expand in order to meet the demand of the people for additional service. Construction to meet such demand cannot be started one day and completed the next. Such construction when reasonable should be encouraged. If at the time of a rate hearing it should appear from the evidence that certain property under construction will be available for use in the way of furnishing service during the period in which the rates in question will be in effect, such property should be included in the rate base. *Munroe Gas, Light & Fuel Co.* v. *P. U. Com.*, 11 F2d 319; *Columbus Gas & Fuel Co.* v. *Columbus*, 17 F2d 630. There are several cases, especially those from public service commissions, which hold to the contrary but we prefer the view taken in the cases which we have cited above. See also *Milne* v. *Montpelier & Barre Light & Power Co.*, P. U. R. 1920 E. 558, a case from our own commission.

But such property should not be so included if the inclu-

sion would result in a double return to the company because interest upon the unfinished construction has been capitalized by the company. *New England Tel. & Tel. Co.* v. *State, supra*; *Ohio Bell Tel. Co.* v. *P. U. Com.*, 131 Ohio St 539, 3 NE2d 475; *In re Southern Bell Tel. & Tel. Co.*, 76 PURNS 33; *Re Lexington Tel. Co.*, 75 PURNS 1; *Public Service Co. of Utah* v. *Mountain Fuel Supply Co.*, 73 PURNS 428. Nor should it be so included if a double return is to be realized because of additional revenue resulting from such property then under constructioin during the rate period in question. *Re Kings County Lighting Co.*, 70 PURNS 374; *Detroit* v. *Eastern Panhandle Pipe Line Co.*, 45 PURNS 203; *Re Commonwealth Tel. Co.*, 41 PURNS 78.

None of the cases cited by the company in support of its claim of error in excluding the item of plant under construction hold that it should be included in the rate base when a double return will result thereby, nor have we found any so holding. The state says in its brief that the company charges interest at the rate of 5% on plant construction and capitalizes this interest. This claim is not denied by the company and is borne out by the record. The company claimed in oral argument, in effect, that any benefit to it from such capitalization is offset by a charge against it of revenue in a similar amount.

The state gives this 5% capitalization charge and other kindred reasons in support of the exclusion. It refers to certain exhibits and evidence in support of its contention. The company says, in effect, that the reasons so advanced by the state are not sound. The issue here presented is essentially one of fact for the commission's determination. *New England Tel. & Tel. Co.* v. *State, supra*. It has made no findings in support of its conclusion that this item was not properly included in the rate base. If upon the evidence in the case any of the reasons appeared which we have indicated would warrant the exclusion of this item, these factual reasons should have been found and stated by the commission. Without such findings we are unable to say whether the commission was right or wrong in its holding.

■ Several rules are followed in dealing with the question of property held for future use. Barnes, The Economics of Public Utility Regulation, p. 425. The one most generally adopted, and the one which appeals to us, recognizes that business judgment must be employed to anticipate future needs and that this judgment may not be arbitrarily interfered with. The test generally applied

by these cases is whether the time for using the property in question is so near that it may properly be held to have the quality of working capital. *Columbus Gas & Fuel Co.* v. *P. U. Com.*, 292 U S 398, 54 S Ct 763, 78 L ed 1327, 91 ALR 1403; *State ex rel. Pac. T. & T. Co.* v. *D. P. S., supra; State* v. *Tri-State Tel. & Tel. Co.*, 204 Minn 516, 284 NW 294; *Pac. Tel. & Tel. Co.* v. *Whitcomb*, 12 F2d 279; *Denver Union Stock Yard Co.* v. *U. S.* 57 F2d 735.

There is no merit to the claim of the company that property held for future use should be included in the rate base as a matter of law. This question, like the preceding one, is one of fact to be determined by the commission. In making this determination it should consider whether the purchase of the property in question was made in pursuance of honest and reasonable business judgment in carrying out some definite plan, for example, or whether the expenditure was dishonest, wasteful or imprudent. The time within which it may reasonably be expected that the property will be used is, as we have indicated, very important in determining the question. The commission has made no findings on any of these essential facts in support of its conclusion that the property should be excluded in determining the rate base. Thus, again, for the lack of such findings we are unable to determine whether the commission was correct in its ruling.

The commission found that the average net return before deducting federal taxes on income to the company on its investment in Vermont for the ten year period 1936 to 1945 inclusive was $2.26 per $100.00 of net investment and that in no year during that period was the rate of net return 4% or more. It also found that at no time during this ten year period did the company request an increase in rates in Vermont. The company did not except to the first of the above findings but did to the second on the grounds that it was irrelevant and had no tendency to determine what is a proper rate of return and to its use by the commission as justifying the limitation of the return to a rate in accord with such ten year experience. As these findings are discussed at considerable length by the parties we will consider both of them, though the first was not excepted to.

The broad question presented to the commission was whether the company was entitled to an increase in its rates for intrastate service and, if so, in what reasonable amount. The commission answered the first part of this question in the affirmative by finding

that because of increased costs including wages, taxes and the price of equipment, the company required an increase in revenue from its operations in Vermont. It put this finding into effect by granting an increase as hereinbefore noted. The amount of the increase to be allowed in order to provide for a just and reasonable rate of return should have been based on the evidence relating to present requirements, for it is shown by all of the cases that what may be a proper rate of return at one time may not be at another. The reasons for this statement are too apparent to warrant discussion. So here, although the evidence as to past rates of return was admissible, it should have had no weight in the commission's determination of the reasonable amount of increase to be granted unless it fairly appeared that such rates, patently low on their face, were reasonable in the sense that the company prospered under them, was able to pay reasonable dividends on its common stock and attract new, needed capital at fair cost. Furthermore this past experience would have no evidentiary value unless it could properly be tied in with present requirements. Ordinarily a low rate of return makes for low prices of securities and higher rates of interest and the fact that a company has continued to operate under such a rate shows the necessity for an increase in rates in order for it to have an adequate return. *Bluefield Water Works and Imp. Co.* v. *W. Va. P. S. Com., supra.* The mere fact that the company did not request an increase during this ten year period should have had no bearing on this question of the reasonable amount of increase. Bluefield case, supra. None of the cases cited by the state having to do with "past experience" are in conflict with what we have just said.

The state claims that as compared with rate schedules in Massachusetts for service of equal value the rates set forth in the schedule as filed by the company to become effective December 1, 1947, are discriminatory and excessive. The state placed in evidence an exhibit showing a comparison of rates in the two states in support of its claim in this respect. No finding is made on this subject matter by the commission so we are unable to ascertain what weight, if any, it attached to this evidence in its determination of the case.

The general rule on this question seems to be that it is not error to exclude evidence of rates in other localities for comparison with those in question unless it appears that all, or substantially all, of the physical and economic factors affecting the

reasonableness of rates are similar in both communities. *P. U. Com. v. Elizabethtown Water Co.,* 43 F2d 478; *Minneapolis* v. *Rand,* 285 F 818. In any event, it is clear that evidence of this kind is of comparatively little significance or value unless similarity of such factors appears. *Smyth* v. *Ames,* 169 U S 466, 18 S Ct 418, 42 L ed 819; *State* v. *Southwestern Bell Tel. Co.,* 115 Kan 236, 223 P 771. Vermont rates must reflect the proper and reasonable costs of business here and may not be fixed according to a standard of rates effective elsewhere. *New England Tel. & Tel. Co.* v. *State, supra; Pittsburg* v. *P. U. Com.,* 158 Pa Super 229, 44 A2d 614.

The company and American Telephone & Telegraph Company are parties to a contract commonly referred to as the license contract. It is not necessary here to set forth in detail the provisions of this contract. It is sufficient to say that under it the company receives certain licenses under patents procured by American and also certain services from the latter company. The contract calls for a payment by New England to American of 1½% of certain gross revenues of the former.

The state devotes many pages in its brief to the claim that the greater part of the payments under this contract should be disallowed. It refers to much evidence which it says supports its claim. The company devotes about the same amount of space to its arguments and references to evidence in support of its claim that the full amount called for in the contract should be allowed. The commission made no findings on this subject matter. Specific findings should have been made with regard to the cost of the services rendered by American to New England and the reasonable amount which should be allowed in this respect to the operating expenses of the latter for its intrastate business in Vermont. *Smith* v. *Ill. Bell Tel. Co.,* 282 U S 133, 51 S Ct 65, 75 L ed 255. Without the aid of such findings we will not attempt to determine this question.

The company cites several cases in its brief to the effect that the entering into of this contract is a matter of business judgment and it must be sustained in toto unless it be found that fraud or bad faith taints the contractual relationship. Most, if not all, of these cited cases were decided before the Smith case, supra. Later cases have followed the rule laid down in that case which must be considered as the one governing this subject matter. The company recognizes this rule as it cites the Smith case and quotes from

it pertinent language and claims that the evidence in this case fulfills the requirements of the rule therein set forth.

The company established a pension plan in 1913. From that time until 1927 it was financed on a pay as you go basis. In that year the company adopted an accrual method known as the Fifteen Year Service Basis. Under this method an irrevocable trust fund was set up which was sufficient to meet the current and future pension payments of those employees who had already been retired and were receiving pensions. On January 1, 1929, this method was changed to a full service basis. This basis did not provide sufficient payments to the fund so that with interest on the fund the full cost of future pensions would be available when due. When the full service accrual basis was adopted the unfunded actuarial liability of the company in respect to its pension plan was $18,085,-000. On April 1, 1937, the company adopted its present method of dealing with the unfunded actuarial reserve requirement. After the amount of that requirement was determined, it was considered to be fixed or frozen just as though it was a fund at hand. Payments were then made into the fund equal to the income which the unfunded requirement would earn if they were actually available for investment. These income payments, called freezing payments, are calculated at 3% of the fixed unfunded actuarial reserve requirement. Such a payment was made into the fund each year. This brief history of the pension plan is taken from statements in the company's brief which do not appear to be questioned by the state.

The issue here concerns the charge of $22,000.00 as operating expense by the company for 1948 for "freezing payments" into the fund. These payments were not allowed by Hill, the state's expert, in his estimate of operating expenses for that year on the ground that they were not part of telephone operating expense and were not so classified by the Federal Communications Commission.

The state in its brief says that it has only unqualified approval for a sound and generously adequate pension fund but denies that the one here in question is of that nature. The main objection of the state to this $22,000.00 charge is that the company permitted a deficiency in the fund of $18,085,000.00 to grow for over eight years without doing anything about it. It says that yearly increments to the deficiency which grew during this eight year period are not current operating costs of 1948 or future years to be charged to present telephone users. The state cites several com-

mission cases in support of its position. The company cites two cases from courts of last resort which hold that on facts similar to the ones here presented, the "freezing payments" are properly to be charged as operating expenses. *State ex rel Pac. T. & T. Co.* v. *Department P. S., supra; Southern Bell Tel. & Tel. Co.* v. *Ga. P. S. Com.*, 203 Ga 832, 49 SE2d 38. The reasoning in these two latter cases appears to us to be sound.

The company says that since there is no dispute as to the facts, the question of whether the freezing payments should be included as an expense is a pure question of law. This statement, if accurate, is correct. The difficulty here in applying this rule is our uncertainty that there is no dispute in the facts. Here again, we have no finding on this subject matter. It is not for us to search the transcript to ascertain whether there is any such dispute. From the cases just above cited it appears that the action taken in 1937 in respect to these "freezing payments" should be sustained unless it was arbitrary or so unreasonable as being an abuse of discretion on the part of those making the decision. The state says that the company does not exercise any discretion with respect to the pension fund; that it takes its orders in this respect from the Bell System of which it is a part. The state also cites testimony from witness Hill to the effect that these payments could have been prevented by setting up an adequate fund at the time the pension plan was first created. The company in its main brief, after stating its position that we have here purely a question of law, makes the statement, with a supporting case, that the expenditure for these payments must be recognized if it is reasonable to make it even though some other course of action might also be reasonable. We cite these matters without in any way indicating what weight, if any, we attach to them but simply to illustrate that findings should be made on this point as on other essential matters in the case. It is recognized in *State ex rel Pac. T. & T. Co.* v. *D. P. S., supra,* that this question of the propriety of the allowance of such "freezing payments" must depend on the facts in each case. Again we will not attempt to answer the question under discussion without findings to help us reach a just decision.

The state complains about alleged excessive salaries paid company officials and extravagant expenditures for advertising. The function of a public service commission is that of control and not of management, and regulation should not obtrude itself into the place of management. *Bacon* v. *B. & M. R. R.*, 83 Vt 421,

442, 76 A 128. This rule is recognized in all of the cases. This matter of salaries and advertising expense calls for the exercise of judgment on the part of the management of the company. Good faith on its part is to be presumed. Although these expenses should be scrutinized with care by the commission they should not be disallowed or reduced unless it clearly appears that they. are excessive or unwarranted or incurred in bad faith. *West Ohio Gas. Co.* v. *P. U. Com.*, 294 US 63, 55 S Ct 316, 79 L ed 761.

Several items of expense discussed by both the company and the state in their briefs which depend entirely on the evidence for their determination present no need for consideration in this opinion.

The commission found that the rates set forth in its order would produce local service revenues for 1948 in the amount of $3,413,598., as herebefore noted; toll service revenues for that year of $1,502,000. and miscellaneous revenues of $156,000. It appears from the briefs that the first item was taken from figures prepared by Hill for the state while the last two items were adopted by the commission from estimates submitted by the company. The state claims, in effect, that inasmuch as the company introduced no evidence to dispute the accuracy of the figures in the first item it stands uncontradicted. The state then says, in substance, that this being so, the rate of return must be based on the first item as applied to the investment in intrastate exchange plant. It says that whatever the company's own intrastate toll rate schedule does to the figures is the company's own lookout. By adopting this method the state arrives at a larger rate of return than could be shown if all of the revenue for 1948 as found by the commission was applied against the total net intrastate investment for that year. This is so as the company admits in its briefs that the intrastate toll rates which it filed will either produce an intrastate toll deficit or no net return. In short, the state claims that under the facts in this case in discussing revenues, expenses and rate of return, the exchange operations must be treated separately. The company, on the other hand, contends that the rate structure must be considered as an integrated whole and not as separate and distinct parts and it says it was so considered by the commission in this case.

It is apparent from the wording of the findings that the commission did use the integrated method in estimating the rate of return. A great majority of the cases approve this method over the severability theory. The underlying reason for such prefer-

ence is that exchange and toll services are not separate and distinct undertakings as each supplements and adds to the usefulness and value of the other. *Re Chesapeake & Potomac Tel. Co.,* 69 PURNS 162; *Re Ind. Bell Tel. Co.,* 72 PURNS 191; *Mich. Bell Tel. Co.* v. *Odell,* 45 F2d 180; *Board of Sup'rs.* v. *Commonwealth,* 186 Va 963, 45 SE2d 145; *Wis. Tel. Co.* v. *P. S. Com.,* 232 Wis 274, 287 NW 122. For a good discussion of the reasons for this preference see *Stone* v. *N. Y. Tel. Co.,* P. U. R. 1921 D 736 at 751.

It is to be assumed that a commission in approving a schedule set forth by a company, or in arranging its own schedule will not permit exchange rates contained therein to be unduly high in comparison with rates for intrastate toll service in order that a reasonable rate of return may be had on the property taken as a whole. A company is entitled to a fair return on its property devoted to toll service, but it is not entitled to earn an unjust proportion of it from services performed by other property. *State* v. *Tri-State Tel. & Tel. Co., supra.* However, an exchange subscriber is properly subject to a reasonable "ready to serve" charge for toll service though he may never use it. *Wis. Tel. Co.* v. *P. S. Com., supra.* The balancing of these rates should be fair both to the company and to the two types of service.

The state claims that the evidence shows poor equipment has been used or furnished by the company in this state; that it has rendered poor service to its consumers; that there is an absence of the element of risk in the conduct of its operations and that the cost of its capital has been moderate. These and other matters, not necessary to mention, are relied upon in support of its contention that the estimated rate of return in excess of 4% is just and reasonable. It impliedly recognizes that this rate is low on its face, as it cites the above mentioned matters in support of its claim that the company is only entitled to a low rate of return on its investment or, at least, is not entitled to a high return.

The fixing of just and reasonable rates involves a balancing of the investor and consumer interests. Hope case, supra; *New England Tel. & Tel.* v. *State, supra.* From the standpoint of the investor it is required that there be enough revenue for capital costs of the business including service on the debt and dividends on the stock. The return to the equity owner should be commensurate with returns on investments in other enterprises having corresponding risks. That return should be sufficient to assure con-

fidence in the financial integrity of the enterprise, so as to maintain its credit and to attract capital. See the two cases just above cited. From the investor point of view a reasonable return should also provide for something to be passed to the surplus account. *United Railways & Electric Co.* v. *West,* 280 US 234, 50 S Ct 123, 74 L ed 390. See also the Bluefield case, supra, for a much quoted statement on this point.

However, a fair return to investors is not necessarily fair to consumers. *Fed. Power Com.* v. *Natural Gas Pipeline Co.,* 315 US 575, 62 S Ct 736, 86 L ed 1037; *New England Tel. & Tel.* v. *State, supra.* "Regulation does not insure that the business shall produce net revenues". *Fed. Power Com.* v. *Natural Gas Pipeline Co., supra.* Rates follow service and a poor standard of service may afford a basis for a denial of a request for higher rates. Barnes, The Economics of P. U. Regulation, supra at p. 293. A utility must be efficiently and economically managed and operated as a condition to the exercise of its right to impose rates adequate to cover the full cost of service and thus satisfy the investor requirement. Barnes, supra; *Bluefield case, supra; P. U. Com.* v. *New England Tel. & Tel. Co.,* P. U. R. 1926 C 207. So here, if it should appear that consumers are not being adequately served because of fault on the part of the company, due to inefficiency or improvidence or other like reasons, the commission should take such inadequacy, and its extent, into consideration in determining the rates to be fixed to the end that a reasonable return, under the circumstances, will result. If the commission should find that the service is inadequate this finding should be set forth in writing with the reasons in support thereof.

We believe that we have given attention to all matters which need be noticed.

*For reasons hereinbefore stated, the order of the Commission is reversed pro forma and the cause remanded for the entry of an order approving the rates made effective February 1, 1947, and for a hearing de novo in accordance with the views herein expressed as to the rates to be effective December 1, 1947.*